Filed 1/29/15  Creed 21 v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CREED-21,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>Defendant and Appellant. | D064186<br><br><br>(Super. Ct. No.<br>37-2012-00098019-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Jan I. Goldsmith, City Attorney, Donald R. Worley, Daniel F. Bamberg, Assistant City Attorneys, Andrea M. Contreras and Jana Mickova, Deputy City Attorneys, for Defendant and Appellant.

Briggs Law Corporation, Cory J. Briggs and Mekaela M. Gladden for Plaintiff and Respondent.

Defendant City of San Diego (City) appeals a judgment granting the petition of plaintiff CREED-21 (CREED) for injunctive and other relief for violation of the

California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] relating to emergency storm drainage repair and revegetation projects in La Jolla.  On appeal, City contends: (1) the trial court erred by setting the CEQA baseline for the revegetation project prior to the issuance of a 2010 emergency permit for the emergency storm drain repair project; (2) the court erred by finding CREED had standing to challenge the prior CEQA emergency exemption for the emergency storm drain repair project; (3) City submitted substantial evidence to support its finding the regular permits for the revegetation project were exempt from CEQA; (4) CREED did not carry its burden to show an exception applied to the exemption for the revegetation project; (5) the court erred by finding CREED was denied due process of law when City did not timely disclose a document requested under the California Public Records Act (CPRA); and (6) the court erred by denying City's request for judicial notice and finding its appeal fee was unauthorized.

                    FACTUAL AND PROCEDURAL BACKGROUND

In June 2007, City's engineering and capital projects department applied for an assessment by City's development services department of a public project known as the 7435 Via Rialto Storm Drain Replacement near 7435 Caminito Rialto in La Jolla.  That project was described as the installation of 135 feet of storm drain pipe, cut-off walls, and a headwall, and the repair of the failed slope.  In August 2007, a limited geotechnical

---

1      All statutory references are to the Public Resources Code unless otherwise specified.

2

investigation report was completed for the project. In April 2008, a biological resources report was completed for the project by Rocks Biological Consulting (RBC). The report described the project as the replacement of 135 feet of damaged storm drain pipe and construction of two new cleanout boxes, several new cutout walls, and headwall within the City's existing easement. RBC created a vegetation map and performed general surveys for flora and fauna on the site. No endangered, threatened, or other rare species were found on the site. However, temporary impacts to sensitive vegetation would occur because of the project, including impacts on 0.3 acres of diegan coastal sage scrub/chaparral and 0.4 acres of southern mixed chaparral.

In or about June 2009, the Via Rialto storm drain failed, causing significant erosion along the adjacent steep slopes and undermining the hillside on which single-family residences were located. City's engineer concluded that if the erosion were allowed to continue, it would present an imminent threat to public safety. He requested City issue an emergency exemption from CEQA to allow reconstruction of the failed storm drain. In so doing, he noted that since the April 2008 biological report, the 2007 replacement project had been modified to eliminate the use of mechanized equipment, resulting in a reduced work area and less impact on sensitive vegetation. He described the proposed emergency work as including the replacement of the failed pipes, construction of a concrete headwall, a modified clean out, and a storm drain rack, rehabilitation of the remaining pipes with cast-in-place pipe, and revegetation of the area

3

with appropriate hydroseed mix and jute matting pursuant to the biological resources report.

On June 19, 2009, City issued a determination of environmental exemption, finding the proposed emergency work was exempt from CEQA pursuant to section 15269(b) of the CEQA guidelines (Cal. Code of Regs., tit. 14, § 15000 et seq.; hereafter Guidelines). That determination described the proposed work as the replacement and upgrading of the failed storm drain pipes with approximately 135 feet of new high-density polyethylene pipes and construction of two new cleanout boxes, new cutout walls, and new headwall. City based the emergency exemption on its engineer's finding that deterioration of the storm drain and metal support systems presented an imminent risk to public health and safety. It found that if the storm drain was not immediately repaired, its existing condition may result in further erosion of the slope and could result in slope failure.

On January 15, 2010, City issued a notice of exemption for the emergency storm drain repair project that had been modified from its June 2009 description. The notice described the work as the installation of a concrete headwall, replacement of about 50 to 55 feet of existing pipe starting from the headwall to where the pipe separation occurred, installation of a modified clean out, application of about 310 square feet of shotcrete to the exposed slope, rehabilitation of the remaining pipe using cast-in-place pipe, and installation of a storm drain rack. The notice also stated the impacted areas would be revegetated with appropriate hydroseed mix and jute and a restoration plan would be

4

submitted to the City Manager after completion of the emergency work. The notice stated the reason for the CEQA exemption was the combination of the very steep slope and resulting erosion caused by the failed pipe were continuously undermining the hillside below single-family homes on Caminito Rialto, and that if the erosion continued unabated, it would present an imminent threat to public safety.

Also on January 15, City issued an emergency permit (No. 133188) approving the requested emergency work, described as:

> "Reconstruct failed storm drain, replacement will include the replacement of failed pipes; upgrade the remaining pipes on the steep slopes, and installation of a new headwall to dissipate the energy of the water flow."

The emergency permit included the express condition that within 60 days City's engineering department "shall apply for a regular coastal permit to have the emergency work be considered permanent. **If a regular permit is not received, the emergency work shall be removed in its entirety within 150 days of the above date unless waived by the City Manager**."[2]

Also on January 15, City's engineering and capital projects department issued an updated biological letter report modifying RBC's April 2008 report to reflect the revised scope of work. The update letter stated that the use of only hand tools and the

_____

[2]     As City notes, San Diego Municipal Code section 126.0718 provides that an emergency coastal development permit may be issued when a coastal emergency exists, but that the emergency coastal development permit shall include a condition requiring the processing of a regular coastal development permit application thereafter for that emergency work.

5

elimination of mechanized equipment would avoid direct impact to sensitive biological resources. The letter revised the type of vegetation communities impacted by the project, the project impact analysis, and the biological resources map. The revised project area was about 2,835 square feet, or about 0.065 of an acre. The letter stated that during three recent site visits no rare, endangered, or threatened plant or animal species were observed. The letter stated that the project would directly impact only "disturbed habitat (Tier IV)" and would no longer impact diegan coastal sage scrub (Tier II) or southern mixed chaparral (Tier III). As described in the April 2008 report, "Tier IV" or "disturbed" habitat, also known as "ruderal" vegetation, "typically includes areas that have been previously disturbed by development or agricultural activities. It includes lands generally cleared of vegetation such that little or no natural habitat remains and lands disturbed such that at least 50 percent of plant cover is broad-leaved non-native species." The update letter stated that under City's biological guidelines, "*impacts to* lands classified as *Tier IV* upland *habitat* are *not considered significant . . . .*" (Italics added.)

In May 2010, the emergency storm drain repair work was completed. In October, City filed an application for a regular coastal development permit and site development permit. In November, a notice of application for the permits was posted. In June 2011, a revegetation/restoration planting plan was prepared by Merkel & Associates, Inc. for City's project. The revegetation plan noted that the storm drain repair work had been completed and City's applications for regular permits for that work would include the

6

revegetation plan for restoration of the impacted area. The goal of the plan was to restore the area entirely with native vegetation (i.e., diegan coastal sage scrub and southern mixed chaparral) and thereby biologically improve on the current postimpact conditions of the site. The plan stated the areas impacted by the storm drain repair work were "mostly devoid of vegetation." The plan provided that the site would be revegetated with a combination of native container plantings and an application of native seed mix hydroseed slurry, with specific species set forth in tables based on the native habitat immediately adjacent to the site. In September, the La Jolla Community Planning Association approved the project.

On November 29, 2011, City issued a notice of exemption (NOE) for the project, describing it as follows:

> "Coastal Development Permit and Site Development Permit for previous emergency work to repair a failed storm water drain. As a result of past heavy rains a portion of the existing storm drain was washed out and on January 11, 2010, the City Engineer requested to perform emergency repair work to the failed storm water drain and eroded steep slope. On January 15, 2010, Development Services staff issued a Determination of Emergency Environmental Exemption and Emergency Coastal Development [Permit] No. 673200. The emergency work was completed in May, 2010. The emergency work restored the storm water drain which included installation of a new 5-foot by 5-foot manhole/cleanout at the failure location, removal and replacement of 55 feet of damaged CMP storm water drain with high density polyethylene (HDPE) storm pipe, lining of the existing storm drain from the street to the inlet to the new manhole/cleanout, and installation of a headwall with an energy dissipater at the outlet. Revegetation of the slope has not been completed; however, a Revegetation Plan is included as part of the Coastal Development and Site Development Permits. *The current project includes the emergency repair work that has already*

7

*been completed plus the proposed revegetation plan.*"   (Italics added.)

City concluded the project was exempt from CEQA, explaining that it had "conducted an Initial Study which determined that the project would not result in significant environmental impacts and meets the criteria set forth in CEQA [Guidelines] Sections 15301, 15302, and 15061(b)(3) (General Rule).  The only physical change associated with the project is the implementation of the revegetation plan.  Since the revegetation would not result in a significant effect on the environment[,] the project would be exempt from CEQA in accordance with Section 15061(b)(3).  Furthermore, since the project replaced an existing storm drain with a new storm pipe without increasing capacity and would return the surrounding vegetation to preexisting conditions[,] the project is exempt from CEQA [Guidelines] Sections 15301 and 15302.  These CEQA sections allow for the replacement of damaged public facilities with new facilities serving the same purpose without increasing capacity."  City concluded the project was exempt from CEQA and the exceptions listed in Guidelines section 15300.2 did not apply.

Also on November 29, City issued a notice of right to appeal (NORA) the environmental exemption determination, which notice CREED apparently received.  On December 5, 2011, CREED filed an appeal of City's environmental determination for the project, arguing it did not qualify for the exemptions stated and had the potential for significant environmental impacts.  Also on December 5, CREED filed a CPRA request with City for any and all initial studies prepared for the project, noting that the NORA referred to an initial study.  When City apparently did not timely provide CREED with

8

that initial study, CREED filed a CPRA action against City, which the parties subsequently settled.

On January 31, 2012, the City council held a hearing on CREED's appeal of the exemption determination for the project and passed a resolution denying its appeal. In the recital provisions of its resolution, the City council stated "the only work that remains to be completed is the revegetation of the slope" and "a Coastal Development Permit and Site Development Permit are proposed for the completed emergency work as well as for revegetation of the slope [(Project)]." It further stated that "approval of the Project would not allow for any physical changes to the environment other than the revegetation of the slope . . . [¶] . . . [and] would not result in a significant effect on the environment . . . ."

On February 15, 2012, City's hearing officer considered the permit application for the project and apparently approved the application. CREED apparently appealed that decision to City's planning commission.

On April 26, 2012, City's planning commission denied CREED's appeal and upheld the hearing officer's written findings that the "overall siting and design of the emergency work and revegetation of the eroded slope does not adversely affect environmentally sensitive lands" and "[t]he project is for emergency work which has been completed and to revegetate the eroded slope." It further found "[t]he emergency work has been completed and the siting and design resulted in no impacts on any adjacent environmentally sensitive lands by including revegetation and erosion control plans to stabilize the slope." City then granted coastal development permit No. 79264 and site

9

development permit No. 79265 for the project, granting permission for the existing storm water drain that was part of the emergency repair and replacement and revegetation of the eroded slope, including an existing concrete headwall and revegetation of the slope. The permits required the establishment and maintenance of the landscape improvements shown on the approved plans and, in particular, the revegetation plan dated November 30, 2011.

On May 25, CREED filed the instant petition for writ of mandate under CEQA and other laws, alleging causes of action for violation of its right to due process for City's untimely disclosure of the initial study, unlawful assessment of an unreasonable appeal fee, and failure to perform any environmental review of the project under CEQA. CREED alleged the project was not exempt from review under CEQA.

On April 25, 2013, the trial court issued a tentative ruling granting CREED's petition. After hearing arguments of counsel on April 26, the court issued an order confirming its tentative ruling. The court concluded it had jurisdiction to consider CREED's objections to the work done under the emergency exemption and no categorical exemption applied to exempt City from conducting environmental review of the project. On June 4, the court entered judgment for CREED. The judgment declared the project permits invalid, declared the project was not exempt from environmental review under CEQA, and enjoined City from undertaking any physical activities relating to the project until the court finds City has issued all required permits and subjected them to

environmental review under CEQA.[3]  The court also issued a peremptory writ of

mandate against City.[4]  City timely filed a notice of appeal.

DISCUSSION

I

*CEQA and Exemption Provisions Generally*

"CEQA is a comprehensive scheme designed to provide long-term protection to

the environment.  [Citation.] . . .  CEQA is to be interpreted 'to afford the fullest possible

protection to the environment within the reasonable scope of the statutory language.' "

(*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)

"CEQA and its implementing administrative regulations (CEQA Guidelines)

establish a three-tier process to ensure that public agencies inform their decisions with

environmental considerations.  [Citation.]  The first tier is jurisdictional, requiring that an

agency conduct a preliminary review to determine whether an activity is subject to

CEQA.  [Citations.]  An activity that is not a 'project' as defined in the Public Resources

Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA."

---

[3]     The copy of the judgment contained in the appellant's appendix shows a handwritten notation initialed by counsel for each party (but not the trial judge) that apparently attempted to amend the judgment, stating: "However, this injunction does not prohibit the City from completing the revegetation portion of the Project."

[4]     The copy of that peremptory writ shows a handwritten notation initialed by counsel for each party (but not the trial judge) that apparently attempted to amend the writ by adding the following language to the injunction: ", except as allowed by the judgment."  For the purposes of deciding this appeal, we need not determine the effect of the handwritten notations to the judgment and peremptory writ of mandate.

(*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379-380, fn. omitted (*Muzzy Ranch*).)

"The second tier concerns exemptions from CEQA review. The Legislature has provided that certain projects, such as ministerial projects and repairs to public service facilities of an emergency nature, are exempt. [Citations.] In addition, pursuant to the Legislature's command [citation], the CEQA Guidelines list categorical exemptions or 'classes of projects' that the resources agency has determined to be exempt per se because they do not have a significant effect on the environment. [Citations.] [¶] A project that qualifies for neither a statutory nor a categorical exemption may nonetheless be found exempt under what is sometimes called the 'commonsense' exemption, which applies '[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment' [citation]." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.)

"If a public agency properly finds that a project is exempt from CEQA, no further environmental review is necessary. [Citation.] The agency need only prepare and file a notice of exemption [citations], citing the relevant statute or section of the CEQA Guidelines and including a brief statement of reasons to support the finding of exemption [citation]. If a project does not fall within an exemption, the agency must 'conduct an initial study to determine if the project may have a significant effect on the environment.' [Citation.] If there exists 'no substantial evidence that the project or any of its aspects may cause a significant effect on the environment' [citation], the agency must prepare a

12

'negative declaration' that briefly describes the reasons supporting its determination [citation]."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 380-381.)

"CEQA's third tier applies if the agency determines substantial evidence exists that an aspect of the project may cause a significant effect on the environment.  In that event, the agency must ensure that a full environmental impact report [i.e., EIR] is prepared on the proposed project."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.)

On appeal, "[o]ur inquiry into whether the [agency] has complied with CEQA extends only to 'whether there was a prejudicial abuse of discretion.'  [Citation.]  In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.)  However, in interpreting the scope of a CEQA exemption or other questions of law, we apply the de novo standard of review.  (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1375 (*San Lorenzo*).)  Also, "[w]hen faced with a challenge to an agency's exemption determination, the court considers whether the agency proceeded in the manner required by law and whether its determination is supported by substantial evidence."  (*Id.* at p. 1381.)

II

*Baseline for the Project under CEQA*

City contends the trial court erred by setting the baseline for the project under CEQA prior to the issuance of the 2010 emergency permit for the storm drain repair

13

work.  It argues that because the emergency work completed in 2010 was exempt from CEQA, the only work remaining to be completed, and thus the only proposed "project" under CEQA, was its revegetation plan.  Therefore, City argues the baseline for the revegetation project should have been established as the physical conditions that existed after the emergency work had been completed (i.e., no earlier than October 2010 when it applied for the regular permits for the emergency work already done and the revegetation work proposed to be done).

A

In its NOE issued on November 29, 2011, City concluded the project was exempt from CEQA.  In so concluding, City found "[t]he *only physical change* associated with the project is the *implementation of the revegetation plan.  Since the revegetation would not result in a significant effect on the environment*[,] the project would be exempt from CEQA in accordance with [Guidelines] Section 15061(b)(3)."  (Italics added.)

In granting CREED's petition challenging the project, the trial court concluded the project was not exempt from CEQA based on its finding that the project's baseline was in 2007 when the storm drain repair work was initially proposed by City.  The court explained environmental review of that proposed work began after June 2007 when City filed its application for that work.  It noted a geotechnical investigation was conducted in August 2007 and a biological resources report was prepared in April 2008.  Although the court acknowledged the storm drain repair work was subsequently performed pursuant to an emergency exemption in 2010, it nevertheless concluded the baseline for the project

14

should remain as of 2007 when the environmental review for the storm drain repair work and revegetation plan were originally proposed. The court rejected City's argument that the baseline should be set after the 2010 emergency work, explaining: "[I]f the City's logic is accepted, it would undermine the purpose of CEQA, as an applicant who is granted an emergency permit would be able to avoid more stringent scrutiny of its project during the regular permitting process due to the fact that it was previously able to obtain this type of permit."

B

To determine whether CEQA's requirements applied to the work done by City in this case, we must first determine whether there was a "project" involved and, if so, what was the nature and scope of that project. "CEQA applies only to 'discretionary *projects proposed to be carried out* or approved by public agencies . . . .'  (§ 21080, subd. (a).)" (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1376, some italics added.)  Thus, CEQA generally applies prospectively to activities to be carried out in the future and not retrospectively to work already completed. Furthermore, "[i]f there [is] no 'project,' there [is] no occasion to prepare either a negative declaration or an EIR." (*Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 663.)  A "project" subject to CEQA is defined as "an *activity* which *may cause* either a *direct physical change in the environment*, or a reasonably foreseeable *indirect physical change in the environment*, and which is any of the following: [¶] (a) An *activity* directly undertaken by any public agency. . . ."  (§ 21065, italics added.)  For example, "projects"

15

or activities directly undertaken by a public agency include public works construction and related activities, clearing and grading of land, and improvements to existing public structures. (Guidelines, § 15378, subd. (a)(1).) For purposes of CEQA, "environment" is defined as "the *physical conditions which exist* within the area *which will be affected by a proposed project*, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance." (§ 21060.5, italics added.)

" 'Project' is given a broad interpretation in order to maximize protection of the environment." (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143.) "Project" refers to "*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a), italics added.) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).) "Whether a particular activity constitutes a project in the first instance is a question of law." (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984.)

If a "project" is proposed within the meaning of CEQA, then the agency must conduct a preliminary review to determine whether the project is exempt from CEQA (i.e., under a statutory exemption, a categorical exemption, or the "common sense" exemption). (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380; see also *Banker's Hill, Hillcrest,*

16

*Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 258.)

Unless a project is exempt, CEQA requires an agency to conduct an environmental review to determine whether a project may have a significant effect on the environment. (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 380-381.)  A " '[s]ignificant effect on the environment' means a substantial, or potentially substantial, *adverse change in the environment*."  (§ 21068, italics added.)  The Guidelines define "[s]ignificant effect on the environment" as "a substantial, or potentially substantial, *adverse change* in any of the physical conditions within the area affected by the project including land [and] . . . flora . . . ."  (Guidelines, § 15382, italics added.)

Under CEQA, an agency must determine what, if any, effect on the environment a proposed project may have.  To do so, a public agency must first make a fair assessment of existing physical conditions (i.e., baseline physical conditions) and then compare it to the anticipated or expected physical conditions were the project completed, thereby allowing the agency to focus on the nature and degree of changes expected in those physical conditions after the project and whether those changes result in any significant effect on the existing environment.  (Guidelines, § 15125, subd. (a); *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319-321, 328 (*Communities*); *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 954-955 [agency must focus on impacts to the existing environment].)  "[T]he comparison must be between existing physical conditions without

17

the [project] and the conditions expected to be produced by the project. Without such a comparison, the EIR [or other environmental review] will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates." (*Communities*, at p. 328.)

C

Based on our review of the administrative record in this case, we conclude the trial court erred by finding the baseline for the project consisted of the physical conditions existing at the site in 2007. Although the court correctly noted environmental review for the storm drain repair work and related revegetation plan began in 2007 when City filed its initial application, we conclude the court misapplied the CEQA statutes and regulations regarding exemptions. As we will explain, the storm drain repair work completed in 2010 pursuant to the emergency exemption was, in effect, an intervening and superseding event that changed the physical environment without any requirement for CEQA review of that work for a significant effect on the environment. Accordingly, after the 2010 emergency work was completed, the only activity to be performed, or the "project," under CEQA was the implementation of the revegetation plan. Therefore, the CEQA baseline for the revegetation project must be set *after* the 2010 emergency work was completed and any qualification for a CEQA exemption and/or significant environmental effect of that project must be considered based on the postemergency work physical environment of the site.

Section 21080, subdivision (b), provides a statutory exemption from CEQA's requirements for certain emergency projects, stating: "This division does not apply to any of the following activities: . . . (4) Specific actions necessary to prevent or *mitigate an emergency*." (Italics added.) CEQA defines an "emergency" as "a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage." (§ 21060.3; see also Guidelines, § 15269.)

City asserts, and CREED agrees, that City correctly found the storm drain repair work done in 2010 was exempt from CEQA pursuant to the statutory exemption for emergency projects. (§§ 21080, subd. (b), 21060.3.) As CREED's counsel argued below, "no one disputes the emergency or the emergency exemption. That was totally fine, totally appropriate." Likewise, on appeal CREED states: "Public safety being crucial, [CREED] does not challenge the need for the emergency work to protect residents living at the top of the canyon" and "[CREED] is not challenging the propriety of operating under an emergency exemption for the emergency work."

However, CREED argues that 2010 emergency exemption was merely for "temporary" work and CEQA nevertheless required City after completion in 2010 of the storm drain repair work to conduct at least a preliminary review, if not also an initial study and EIR, to determine whether the storm drain repair work already completed may

19

have a significant effect on the environment. In so arguing, CREED does not cite any provision of CEQA or the Guidelines to support its position. Instead, it relies solely on a condition of the emergency permit issued by City, which was based on the San Diego Municipal Code. As noted above, the January 15, 2010, emergency permit for the storm drain repair work included the express condition that within 60 days City's engineering department "shall apply for a regular coastal permit to have the emergency work be considered permanent. **If a regular permit is not received, the emergency work shall be removed in its entirety within 150 days of the above date unless waived by the City Manager**." As City notes, San Diego Municipal Code section 126.0718 provides that an emergency coastal development permit may be issued when a coastal emergency exists, but the emergency coastal development permit shall include a condition requiring the processing of a regular coastal development permit application thereafter for that emergency work. Accordingly, any "temporary" status of the emergency work performed by City in 2010 was based solely on the San Diego Municipal Code and *not* on CEQA or the Guidelines.[5] Because CREED's petition did not allege any violation of the San Diego Municipal Code independent of CEQA's environmental review requirements, it cannot now argue the trial court's declaratory and injunctive relief, based on violation of CEQA,

_____

[5] Because there is nothing in the record that may enlighten us on the legislative intent underlying that San Diego Municipal Code provision, we cannot, and for purposes of this opinion need not, ascertain why City requires work performed pursuant to an emergency permit to be conditioned on subsequently obtaining a regular permit for work already completed. We further note San Diego Municipal Code section 126.0718 does not require any environmental review under CEQA as a condition for issuance of a regular permit subsequent to an emergency permit.

20

can instead be affirmed based on a violation of the San Diego Municipal Code. In any event, on April 26, 2012, City did, in fact, issue the regular site and coastal development permits for the emergency work completed at the site.

Because CEQA and the Guidelines do not contain any provisions for environmental review of emergency projects, any emergency work completed pursuant to an emergency exemption and permit is deemed to be done outside of CEQA's requirements and therefore no subsequent environmental review of that completed work is required.[6] "[T]he question of [environmental] impact is irrelevant to the emergency exemption. . . . [T]he text of the emergency exemption does not address the question of impact [on the environment]. Indeed, the self-evident purpose of the exemption is to provide an escape from the EIR requirement despite a project's clear, significant impact." (*Western Mun. Water Dist. v. Superior Court, supra*, 187 Cal.App.3d at p. 1113.) Whether the work completed pursuant to an emergency exemption and permit is a short-term or "stop-gap" measure or long-term or "permanent" construction, that work is

---

[6]     We note, however, there may be cases in which the issuance of the emergency exemption and permit may be timely challenged based on contentions that there was not a qualifying "emergency" under CEQA or the work to be done exceeded the nature and/or scope of the emergency exemption. (See, e.g., *CalBeach Advocates v. City of Solana Beach* (2002) 103 Cal.App.4th 529; *Castaic Lake Water Agency v. City of Santa Clarita* (1995) 41 Cal.App.4th 1257; *Western Mun. Water Dist. v. Superior Court* (1986) 187 Cal.App.3d 1104.) That is not the contention in this case, and there is no evidence to support an assertion City improperly issued an emergency exemption and permit for the storm drain repair work to subvert CEQA and improperly avoid environmental review of that work. (Cf. *Western*, at pp. 1113-1115.) In any event, CREED did not timely challenge City's issuance of the emergency exemption and permits in this case, and therefore cannot collaterally attack them in this appeal.

21

exempt from CEQA's environmental review provisions. Therefore, the "permanent" emergency repair of the storm drain pipe in this case, like the emergency repair of the hypothetical dam referred to in *Western Mun. Water Dist.*, at page 1111, was exempt from CEQA's requirements and therefore no environmental review of that work was required under CEQA either before or after it was completed. *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, cited by CREED, is factually inapposite to this case and does not persuade us to reach a contrary conclusion.

One effect of the emergency exemption and permits for the storm drain repair work completed in this case is that the physical environment existing at the site in 2010 changed for purposes of CEQA review and any future work proposed to be completed at that site was required to be considered under CEQA based on the physical environment that existed thereafter without any environmental review of the emergency work completed in 2010 and without any consideration of the physical conditions that existed prior to that emergency work. That means the revegetation plan, the only work to be done at the site after 2010 and not included in the emergency exemption and permits, must be reviewed under CEQA based solely on the physical environment that existed *after* completion in 2010 of the emergency storm drain repair work. It is against those post-2010 repair work physical conditions that any proposed future work was to be considered under CEQA. Alternatively stated, the baseline for consideration of the

22

revegetation plan under CEQA was the post-2010 emergency work physical conditions and *not* the 2007 pre-emergency work physical conditions of the site.

The "environment" under CEQA is "the *physical conditions which exist* within the area *which will be affected by a proposed project*, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance." (§ 21060.5, italics added.) Because CEQA "applies only to 'discretionary *projects proposed to be carried out* or approved by public agencies' " (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1376, some italics added) and the revegetation plan was the only "project" under CEQA proposed to be carried out at the site after completion of the 2010 emergency work, CEQA applies only to the revegetation plan and not to the work done as part of the 2010 emergency storm drain repair. Therefore, in conducting a preliminary review of the revegetation project under CEQA, City was charged with making a comparison between the existing physical conditions after the 2010 emergency work was completed without the revegetation project and the conditions expected to be produced by the revegetation project. (*Communities*, *supra*, 48 Cal.4th at p. 328.) Those baseline conditions are the actual environmental conditions (i.e., real conditions on the ground) existing at the time environmental analysis of the proposed project was commenced. (*Id*. at pp. 315, 321.) We discuss below whether there is substantial evidence to support City's determination that the revegetation project was categorically exempt from CEQA based on that comparison and other considerations.

III

*CREED's Standing*

City contends the trial court erred by finding CREED had standing to challenge City's determination that an emergency exemption under CEQA applied to its 2010 storm drain repair work.

A

In granting CREED's petition, the court concluded it had jurisdiction to consider CREED's objections to the storm drain repair work City performed under the emergency exemption. The court stated: "As a preliminary matter, the Court notes that the City stated that it does not contest [CREED's] standing to challenge the exemptions applied for the after-the-fact permits. [Citation.] However, it does contend that the Court has no jurisdiction to hear [CREED's] objections to work done under the emergency exemption. The Court disagrees." The court apparently based its conclusion on the presumed hesitance of trial courts in general to issue a temporary restraining order and delay emergency repairs if a party timely challenges an agency's emergency exemption determination.

B

City asserts the trial court erred by concluding CREED had standing to challenge City's determination that an emergency exemption under CEQA applied to its 2010 storm drain repair work even though CREED did not timely challenge that determination. Absent a timely challenge to an agency's emergency exemption determination, any

24

emergency work completed pursuant to that exemption determination cannot thereafter be collaterally challenged. (See § 21167, subd. (d) [providing a 35-day period for challenging a notice of exemption and, if none was properly filed, a maximum 180-day statute of limitations for challenges to agency determinations under CEQA]; see also Guidelines, § 15062, subd. (d).) Therefore, CREED did not have standing to challenge City's storm drain repair work completed in 2010 pursuant to its emergency exemption determination. Any concern of the court regarding the hesitancy of courts to issue temporary restraining orders on timely-filed challenges to emergency exemption determinations is not sufficient to create standing for a party that did not timely file a challenge to that determination. City correctly asserts CREED had standing to challenge only City's determination that its revegetation project was exempt from CEQA.

To the extent CREED argues it retained standing to challenge the "permanent" aspects of the emergency storm drain repair work but not the "temporary" emergency work, it misconstrues and/or misapplies CEQA and the Guidelines. As discussed above, *all* emergency work, whether considered "temporary" or "permanent" work, is exempt from CEQA environmental review. (§§ 21080, subd. (b), 21060.3; see also Guidelines, § 15269.) Therefore, absent a timely challenge to an agency's emergency exemption determination, a party does not have standing to challenge that determination, whether or not the emergency work is considered "permanent." Likewise, CREED wrongly argues City's NOE, in effect, gave it a "second bite at the apple" because City described the work covered thereby as the "emergency repair work that has already been completed plus the

25

proposed revegetation plan." To the extent City included the completed emergency repair work in its NOE, 2011 exemption determination, and 2012 regular site and coastal development permits, that inclusion was redundant and unnecessary. As discussed above, the 2010 storm drain repair work was exempt from CEQA on City's determination that the work was exempt under section 21080, subdivision (b). Thereafter, no subsequent or additional exemption determinations were necessary. To the extent City thereafter found its completed storm drain repair work was exempt from CEQA, it was merely confirming its prior emergency exemption determination.

IV

*CEQA Exemption for Revegetation Project*

City contends it had substantial evidence to support its finding that the regular, nonemergency site and coastal development permits for the revegetation project were exempt from CEQA's requirements under either the common sense exemption or a categorical exemption.

A

In issuing its NOE in November 2011, City concluded the project was exempt from CEQA, explaining it had conducted a study that determined "the project would not result in significant environmental impacts and meets the criteria set forth in CEQA [Guidelines] Sections 15301, 15302, and 15061(b)(3) (General Rule). *The only physical change associated with the project is the implementation of the revegetation plan. Since the revegetation would not result in a significant effect on the environment*[,] *the project*

26

*would be exempt from CEQA in accordance with Section 15061(b)(3).*"  (Italics added.)

City relied primarily, if not exclusively, on Guidelines section 15061, subdivision (b)(3), or the common sense exemption, to find the revegetation project was exempt from CEQA.

B

CEQA does not apply to projects that are statutorily or categorically exempt or fall under the "common sense" exemption.  (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1380-1381.)  The Guidelines "list categorical exemptions or 'classes of projects' that the resources agency has determined to be exempt per se because they do not have a significant effect on the environment.  [Citations.] [¶] A project that qualifies for neither a statutory nor a categorical exemption may nonetheless be found exempt under what is sometimes called the 'commonsense' exemption, which applies '[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment' [citation]."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.)

Section 15061, subdivision (b), of the Guidelines provides that a project is exempt from CEQA if it is: (1) exempt by statute; (2) exempt pursuant to a categorical exemption; or (3) the activity is covered by "the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment" (i.e., the "common sense" exemption).  "A categorical exemption is based on a finding by the Resources Agency that a class or category of projects does not have a significant

effect on the environment." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 115 (*Davidon*).) The common sense exemption applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment . . . ." (Guidelines, § 15061, subd. (b)(3).) "A discussion accompanying this Guideline explains its purpose as follows: 'Subsection (b)(3) provides a short way for agencies to deal with discretionary activities which could arguably be subject to the CEQA process but which common sense provides should not be subject to the Act. [¶] This section is based on the idea that CEQA applies jurisdictionally to activities which have the potential for causing environmental effects. Where an activity has no possibility of causing a significant effect, the activity will not be subject to CEQA.' " (*Davidon*, *supra*, 54 Cal.App.4th at pp. 112-113.)

On appeal, we must determine whether the agency abused its discretion by finding a project exempt from CEQA and, in so doing, we review the administrative record de novo to determine whether the agency proceeded in the manner required by law and whether there is substantial evidence to support the agency's finding that a project is exempt under a statutory or categorical exemption or the common sense exemption. (§ 21168.5; *San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1375, 1381-1382; *Davidon, supra*, 54 Cal.App.4th at pp. 112-113.) Substantial evidence "may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold." (*San Lorenzo*, at p. 1386.) "The scope of an exemption may be analyzed as a question of statutory interpretation and thus subject to independent review."

28

(*Id*. at p. 1382.)  Nevertheless, courts should not expand exemption categories beyond the reasonable scope of their statutory language.  (*Mountain Lion Foundation v. Fish & Game Com.*, *supra*, 16 Cal.4th at p. 125.)

C

Based on our review of the administrative record, we conclude there is substantial evidence to support City's determination that the revegetation project was exempt from CEQA pursuant to the common sense exemption under Guidelines, § 15061, subdivision (b)(3).  As discussed above, on January 15, 2010, *before* the emergency storm drain repair work began, City's engineering and capital projects department issued an updated biological letter report modifying RBC's April 2008 report to reflect the revised scope of work.  The update letter stated the revised project area was about 2,835 square feet, or about 0.065 of an acre.  The letter stated the project would directly impact only "disturbed habitat (Tier IV)," also known as ruderal vegetation.  The letter stated that under City's biological guidelines, "*impacts to* lands classified as *Tier IV* upland *habitat* are *not considered significant* . . . ."  (Italics added.)

In June 2011, *after* completion of the emergency storm drain repair work, a revegetation/restoration planting plan was prepared by Merkel & Associates, Inc., for City's project.  The goal of the plan was to *restore* the area entirely with native vegetation (i.e., diegan coastal sage scrub and southern mixed chaparral) and thereby *biologically improve* on the current postimpact conditions of the site.  The plan stated the areas impacted by the storm drain repair work were "*mostly devoid of vegetation*."  (Italics

29

added.)  The plan provided that the site would be revegetated with a combination of native container plantings and an application of native seed mix hydroseed slurry, with specific species set forth in tables based on the native habitat immediately adjacent to the site.

Thereafter, apparently in November 2011, Jeff Szymanski, City's environmental planner for the project, completed a two-page preliminary review worksheet (or, as the parties refer to it, an "initial study") to determine whether the project might have any significant effect on the environment.  After apparently reviewing the original April 2008 biological resources report and the June 2011 revegetation plan, he found the revegetation plan was the only proposed physical change to the existing area.  He noted the existing habitat at the site was a mix of native and nonnative plants.  He concluded the project would have no impact on the site's biological resources.  He further found the revegetation plan would return the slope to its previous conditions and improve the site's visual quality.

In its November 2011 NOE, City concluded that because the revegetation plan "*would not result in a significant effect on the environment*[,] *the project would be exempt from CEQA in accordance with Section 15061(b)(3)*."  (Italics added.)  City concluded the revegetation project was exempt from CEQA under the common sense exemption of Guidelines, section 15061, subdivision (b)(3).

Based on that evidence, it is undisputed that the existing physical conditions of the site in 2011 (*after* the emergency storm drain repair work had been completed) consisted

30

primarily of bare dirt. The site was described as "mostly devoid of vegetation." That 2011 postemergency work condition of the site constituted the baseline against which the proposed project, or revegetation plan, was to be compared in City's determination whether the project might have a significant effect on the environment. The existing physical conditions, or real conditions on the ground, in 2011, when the project was analyzed for any possible significant effect on the environment, therefore consisted mostly of bare *dirt* and vegetation that was mostly *nonnative plants*. In comparison, the revegetation plan proposed to install *native plants,* thereby clearly improving the physical conditions at the site. Although the revegetation plan would change or alter the site's 2011 physical conditions, it is only "a substantial, or potentially substantial, *adverse* change in any of the physical conditions" that constitutes a "significant effect on the environment" within the meaning of CEQA. (Guidelines, § 15382, italics added; see also § 21068.) Because the revegetation plan indisputably would *improve* the site's physical conditions compared to its 2011 physical conditions, that plan would *not* result in any *adverse* change in its physical conditions. Therefore, the revegetation plan could have no significant effect on the environment within the meaning of CEQA. Because the evidence in the administrative record shows "with certainty that there is no possibility that the activity in question [i.e., the revegetation plan] may have a significant effect on the environment" (Guidelines, § 15061, subd. (b)(3)), we conclude there is substantial evidence to support City's determination that the revegetation project was exempt from CEQA pursuant to the common sense exemption (i.e., Guidelines, § 15061, subd. (b)(3))

31

and therefore conclude City did not abuse its discretion by so finding. The trial court erred by concluding there was insufficient evidence to support City's determination that the project was exempt from CEQA.[7]

Because we conclude there is substantial evidence to support City's determination the revegetation project was exempt from CEQA under the common sense exemption, we need not address the possible alternative exemptions cited by City (i.e., Guidelines, §§ 15301, 15302.) Nevertheless, we note it is possible the revegetation plan was exempt under the "Class 1" exemption for "existing facilities," which applies to "repair . . . or minor alteration of existing public . . . facilities, . . . or *topographical features*, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination." (Guidelines, § 15301, italics added.) Among the various nonexclusive examples listed in that section is the example of "[m]aintenance of existing landscaping [and] native growth . . . ." (Guidelines, § 15301, subd. (h).) It would seem logical that

_____

7       In opposition to City's contention, CREED primarily argues the project must be viewed as a whole (i.e., both the emergency storm drain repair work and the revegetation plan) and with a 2007 baseline (i.e., before the emergency storm drain repair work was completed). Because we considered those arguments above, we need not address them again. In any event, we are not persuaded by CREED's argument that there is insufficient evidence to support City's determination the project was exempt from CEQA. CREED wrongly asserts in its respondent's brief that there is "nothing in the record discuss[ing] the revegetation plan in any detail" and City's appellate counsel "fabricat[ed]" its reference to native plants. As discussed above, the administrative record contains evidence regarding the details of the revegetation plan, including the types and quantity of native plants to be installed at the 2,835 square foot site.

32

the *improvement*, and not mere maintenance, of the existing landscape with native plants would similarly be exempt under that section.[8]

V

*Unusual Circumstances Exception*

City contends CREED did not carry its burden to present substantial evidence to show an exception applied to the exemption for the revegetation project based on a reasonable possibility that the project may have a significant effect on the environment.

A

The Guidelines provide exceptions to categorical exemptions. (Guidelines, § 15300.2.) "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (*Id*., subd. (c).) Under that provision, a challenger must show not only the existence of unusual circumstances, but also that there is a reasonable possibility the project will have a significant effect on the environment because of those unusual circumstances. (Guidelines, § 15300.2, subd. (c); *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 800 (*Santa Monica*).)

---

[8]    We note City could also have considered whether the revegetation project was exempt from CEQA under Guidelines, sections 15304 [minor alterations in the condition of land and/or vegetation (e.g., "[n]ew gardening or landscaping")] and 15333 [habitat restoration projects under five acres in size (e.g., "revegetation of disturbed areas with native plant species")]. Although we need not address the applicability of those possible categorical exemptions based on the administrative record in this case, they nevertheless appear to support City's determination that the revegetation project was exempt from CEQA as not having any significant effect on the environment.

Although the Guidelines do not define the term "unusual circumstances," case law has interpreted that term as "some feature of the project that distinguishes it" (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251) from others in the exempt class (*id.* at p. 1251), which is unusual "relative to the *typical* circumstances related to an otherwise typically exempt project" (*Santa Monica*, at p. 801).  Cases have held the presence of similar facilities in the local area precludes the existence of unusual circumstances.  (See, e.g., *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1314-1316; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 826-827.)

"[O]nce an agency . . . determines, based on substantial evidence in the record, that the project falls within a categorical exemption . . . , the burden shifts to the challenging party . . . to ' "produce substantial evidence . . ." ' . . . that one of the exceptions to categorical exemption applies."  (*Santa Monica*, *supra*, 101 Cal.App.4th at p. 796.)  The appropriate standard in reviewing on appeal whether an exception applies to a categorical exemption is unclear.  (*Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855-856 [noting split of authority].)  Some courts have applied the "fair argument" standard (i.e., is there a fair argument based on substantial evidence the project will have a significant effect on the environment), and other courts have applied the ordinary substantial evidence standard (i.e., deferring to agency's finding the categorical exemption applies).  (*Id*. at p. 856, citing *Fairbank v. City of Mill Valley*, *supra*, 75 Cal.App.4th at pp. 1259-1260.)  To resolve this appeal, we need not decide which standard is appropriate in determining whether CREED carried its burden to

present evidence showing the "unusual circumstances" exception applied to City's exemption determination, because under either standard we conclude CREED did not satisfy its burden.

B

Although CREED argued below there was a reasonable possibility that the project would have a significant effect on the environment because of its unusual circumstances, it did not present or cite any evidence showing that reasonable possibility existed.[9] CREED primarily cited circumstances relating to the emergency storm drain repair work completed in 2010. However, as discussed above, those circumstances are irrelevant to the determination whether the 2011 *revegetation* plan was exempt from CEQA.

CREED also argued the project's site was located on steep slopes, which City regards as environmentally sensitive lands, and therefore any work, including the revegetation project, done on that site is necessarily "unusual." However, a circumstance is "unusual" if it is unusual relative to the typical circumstances of an otherwise typically exempt project. (*Santa Monica*, *supra*, 101 Cal.App.4th at p. 801.) CREED did not present any evidence showing the revegetation plan for the site was unusual compared to other typically exempt projects (e.g., other exempt revegetation plans). (*Ibid*.) CREED did not present any evidence showing that the site's steep slope or environmentally sensitive land was so unusual compared to other steep slopes or lands in La Jolla or other

---

9    Because the trial court concluded the project was not exempt from CEQA, it did not decide the question whether CREED had carried its burden to show an exception to the project's exemption applied.

35

parts of the San Diego area or, for that matter, other typically exempt projects, that "unusual circumstances" existed under Guidelines, section 15300.2, subdivision (c).[10] Furthermore, CREED did not show the 2011 revegetation plan for a steep slope or environmentally sensitive land is an unusual method for "revegetating" the site or stabilizing the slope when compared to other exempt revegetation or slope stabilization plans. CREED did not carry its burden to show "unusual circumstances" existed.

In any event, assuming arguendo that unusual circumstances existed, CREED nevertheless did not present any evidence showing there is a reasonable possibility the revegetation project will have a significant effect on the environment because of those unusual circumstances. CREED argues on appeal that there is a reasonable possibility the storm drain repair work will have a significant effect on the environment. However, as noted above, that argument is misguided because the only project exemption challenged in this appeal is the 2011 revegetation project and not the 2010 emergency storm drain repair work. Furthermore, as we concluded above, the revegetation plan indisputably would *improve* the existing physical conditions of the site (mostly bare dirt and nonnative plants) by installing native plants to reflect the vegetation in the areas adjacent to the site. Without any possibility of an *adverse* change to the environment,

_____

[10] To the extent CREED cites the 2008 biological resources report's statement that the storm drain repair project had the potential for increased erosion due to vegetation modification, it again erroneously misconstrues the relevant "project" as the storm drain repair work. As we concluded above, the "project" in this case is the revegetation plan and the project's baseline is the physical conditions of the site that existed *after* the emergency storm drain repair work was completed.

36

there can be no significant effect on the environment under CEQA. (§ 21068; Guidelines, § 15382.) CREED's argument, speculation, or unsubstantiated opinion or narrative to the contrary does not constitute substantial evidence showing the unusual circumstances exception to the project's exemption applies. (§ 21080, subd. (e)(2); Guidelines, § 15384, subd. (a); *Hines v. California Coastal Com.*, *supra*, 186 Cal.App.4th at pp. 856-858; *San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1390; *Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 477; *Apartment Assn. of Greater Los Angeles v. City of Los Angeles, supra,* 90 Cal.App.4th 1162, 1176.) CREED did not carry its burden to show that exception applied.

## VI

### *Due Process of Law*

City contends the trial court erred by finding CREED was denied due process of law when City did not timely disclose a document requested under the CPRA.

### A

In November 2011, City's staff prepared a two-page preliminary review (or "initial study") worksheet evaluating whether the proposed revegetation project might have a significant effect on the environment. On November 29, 2011, City issued a NOE finding the revegetation project was exempt from CEQA pursuant to the common sense exemption under Guidelines section 15061, subdivision (b)(3). That NOE referred to an "Initial Study" conducted by City. Also on November 29, City issued a NORA, which CREED apparently received. On December 5, CREED appealed City's environmental

37

determination for the project. Also on December 5, CREED filed a CPRA request asking City for a copy of the "Initial Study" on which it relied in finding the project was exempt. On January 31, 2012, the City council heard and denied CREED's appeal of City's exemption determination. However, City did not provide CREED with a copy of the "Initial Study" until *after* that hearing.

In granting the instant petition, the trial court found City had violated CREED's right to due process of law and a fair hearing when it did not timely provide CREED with a copy of the "Initial Study" before or at the time of its hearing of CREED's appeal of the exemption determination for the project. However, in so doing, the court considered the "project" as including both the emergency storm drain repair work completed in 2010 and the proposed revegetation plan for the site. The court reasoned that because the "Initial Study" considered only the possible effect on the environment by the revegetation plan and did not consider the "whole project" (i.e., both the completed emergency storm drain repair work and the proposed revegetation plan), CREED's lack of the Initial Study at the appeal hearing denied it a fair hearing on its appeal.

B

City asserts the trial court erred by finding it violated CREED's right to due process of law when City heard CREED's appeal before providing it with a copy of the "Initial Study." It argues CREED received both reasonable notice of the appeal hearing and a reasonable opportunity to be heard, thereby giving it procedural due process.

38

"Due process . . . 'does not require any particular form of notice or method of procedure.  If the [administrative remedy] provides for reasonable notice and a reasonable opportunity to be heard, that is all that is required [for due process]. [Citations.]' " (*Bockover v. Perko* (1994) 28 Cal.App.4th 479, 486.)  Due process requires a fair trial before an impartial tribunal, but it is the substance, and not the technical formalism, of an administrative procedure that affords due process.  (*Id*. at p. 488; *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 90.)

Based on our review of the administrative record in this case, we conclude CREED was not denied its right to due process of law and a fair hearing.  It received notice of the hearing of its appeal of the NOE.  CREED also had a reasonable opportunity to be heard at that appeal hearing.  It was represented at the hearing and argued for a finding that the project was not exempt from CEQA.  CREED argued it made a CPRA request for the initial study referred to in the NOE, the agenda materials did not include that study, and City had a history of using "bogus" emergency exemptions to grant project permits without CEQA environmental review.  Szymanski appeared at the hearing and stated he had prepared City's initial study for the revegetation project and concluded it was categorically exempt from CEQA.  The City council unanimously denied CREED's appeal.  In its January 31, 2012, resolution denying the appeal, the City council noted the emergency storm drain repair work had been completed in May 2010 and the only work remaining to be completed was the revegetation of the site.  It found approval of the project would not allow any physical changes to the environment other than

39

revegetation of the site and therefore would not result in a significant effect on the environment.

Based on the record, there is nothing to support CREED's assertion it was denied procedural due process based on City's failure to provide it with a copy of the initial study before the appeal hearing. The City council did not have the initial study and instead apparently relied on the other documents before it, as well as Szymanski's statements at the hearing, in deciding to deny CREED's appeal. The fact CREED did not have that one item of evidence (i.e., the initial study) at the time of the appeal hearing did not violate its right to due process of law and a fair hearing. It received reasonable notice of the hearing and a reasonable opportunity to be heard at the hearing. Furthermore, the "missing" initial study merely reflected Szymanski's conclusion that he stated at the hearing. CREED does not cite anything of substance in the initial study that could have changed the City council's decision to deny its appeal. In fact, as we discussed above, the "project" involved in this appeal consisted only of the 2011 revegetation plan and not the 2010 storm drain repair work completed pursuant to a previous exemption (i.e., a statutory emergency exemption).

To the extent CREED complained below, and now complains on appeal, that the initial study addressed only the 2011 revegetation plan and ignored the environmental impact of the 2010 storm drain repair work, the initial study was not deficient and properly addressed only the possible environmental impact of the revegetation plan. *English v. City of Long Beach* (1950) 35 Cal.2d 155, cited by CREED, is inapposite to

40

this case and does not persuade us to reach a contrary conclusion. Unlike this case, *English* involved an administrative tribunal that based its decision in part on evidence received without the knowledge of the parties. (*Id*. at p. 158.) In this case, the record shows the City council, like CREED, did not have the initial study and therefore did not base its decision on the content of that study. The trial court erred by finding City violated CREED's right to due process of law and a fair hearing.

VII

*Trial Court's Denial of City's Request for Judicial Notice*
*and Finding That Its Appeal Fee Was Unauthorized*

City contends the trial court erred by denying its request for judicial notice and finding its appeal fee was unauthorized.

A

CREED's petition alleged a cause of action against City for the unlawful assessment of an unreasonable appeal fee. It alleged there was no provision in the San Diego Municipal Code that authorized a fee for an administrative appeal. Accordingly, CREED sought an order requiring City to return three $100 appeal fees it had paid in this matter. In its opposition brief below, City argued its development services department properly charged CREED a $100 fee for each appeal because case law holds administrative agencies may charge pre-hearing fees to process appeal hearings.

Prior to its April 26, 2013, hearing on the petition, the trial court apparently issued a tentative ruling finding City's appeal fee was unauthorized. At the hearing, City attempted to file a request for judicial notice of a document purporting to be an ordinance

41

adopted by the City council authorizing certain fees, including an appeal fee. The trial court denied the request for judicial notice as untimely filed, stating it was "too late" and its tentative ruling was already released before the request was made. CREED argued at the hearing that an appeal fee must be both lawfully approved and reasonable. It also argued the copy of the City ordinance that purportedly authorized an appeal fee was not authenticated by the signatures of the City clerk and mayor and also did not bear a stamp or other indication it was true and correct under penalty of perjury. More importantly, it argued the copy did not include the attachment listing the specific fees approved by City. City's counsel replied that she was "really sad" that the last page of the ordinance (apparently the attachment listing the specific fees) was not included in City's request for judicial notice.

On April 30, the trial court issued its order denying City's request for judicial notice and granting CREED's request for an order requiring City to refund the appeal fees it paid. In denying City's request for judicial notice, the court stated City had not provided any evidence explaining why the copy of the purported ordinance had not been produced earlier. It further found the copy of the purported ordinance was incomplete and did not indicate it was authenticated as required by the City charter. The court noted, in general, evidence not contained within the record is inadmissible. Thereafter, the court granted CREED's request for a refund of the appeal fees it paid to City, finding City conceded no provision in the San Diego Municipal Code authorized a fee for an administrative appeal. Furthermore, although City argued the ordinance that authorized

42

the fee was not codified, the court denied its request for judicial notice of that purported ordinance.

B

City asserts the trial court erred by denying its request for judicial notice. Evidence Code section 452, subdivision (b), provides that a court "may" take judicial notice of "[r]egulations and legislative enactments issued by or under the authority of the United States or any public entity in the United States."  The parties do not dispute that an ordinance properly adopted by City qualifies for such judicial notice.  Evidence Code section 453 provides:

> "The trial court *shall* take judicial notice of any matter specified in Section 452 if a party requests it and:
>
> "(a)  Gives each adverse party *sufficient notice* of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and
>
> "(b)  Furnishes the court with *sufficient information* to enable it to take judicial notice of the matter."  (Italics added.)

We apply the abuse of discretion standard in reviewing a trial court's ruling denying a request for judicial notice (i.e., we affirm the ruling unless the information provided to the trial court was so persuasive that no reasonable judge would have denied the request for judicial notice).  (*Willis v. State of California* (1994) 22 Cal.App.4th 287, 291.)

Based on our review of the record, we conclude the trial court did not abuse its discretion by denying City's request for judicial notice of the copy of the purported ordinance.  First, the court properly found City had not given CREED sufficient notice of

43

its request for judicial notice to enable CREED to have a reasonable opportunity to prepare its opposition to the request and obtain information relevant to the matter to be noticed. Although the parties do not cite, and we are unaware of, any published case interpreting the term "sufficient notice" required under Evidence Code section 453, subdivision (a), we conclude the trial court did not abuse its discretion by finding City did not meet that requirement in the circumstances of this case. CREED's petition sought a refund of the appeal fees it paid City. At the time it filed its opposition papers, City did not cite any ordinance that purportedly authorized that fee, nor did it request judicial notice of that ordinance at that time. The court apparently issued its tentative ruling the day before the scheduled April 26, 2013, hearing on CREED's petition. City apparently did not submit its request for judicial notice until the morning of the April 26 hearing. In so doing, the court could reasonably find CREED did not receive "sufficient notice" of that request under Evidence Code section 453, subdivision (a). The court could reasonably find CREED did not have a reasonable opportunity to prepare its opposition to the request and obtain information relevant to the matter to be noticed prior to the trial court's consideration of the request for judicial notice and the petition. The court properly found City did not satisfy the first requirement for mandatory judicial notice under Evidence Code section 453.

We further conclude the trial court properly found City did not satisfy the second requirement for mandatory judicial notice under Evidence Code section 453, namely, that City did not furnish the court with "sufficient information" to enable it to take judicial

44

notice. (Evid. Code, § 453, subd. (b).) The court found the copy of the purported ordinance was incomplete, presumably referring to the absence of the attachment that apparently contained the list of specific fees approved by the City council (e.g., the appeal fee). In its opening appellant's brief, City concedes "the actual fee schedule was not attached to the copy [of the ordinance] submitted at the writ hearing."[11] Because the copy of the document City included in its request for judicial notice did not include a copy of the attachment referred to therein that apparently contained the list of specific fees approved by the City council (e.g., the specific fee for an administrative appeal), the trial court properly found the document included in City's request for judicial notice was incomplete and therefore it did not have "sufficient information" for the court to take judicial notice of it. (Evid. Code, § 453, subd. (b).) Because the trial court properly found City did not satisfy either of the two requirements for mandatory judicial notice under Evidence Code section 453, it properly denied City's request for judicial notice.[12]

[11] In an apparent attempt to cure that omission below, City has filed in this court a request for judicial notice of a copy of the purported ordinance that includes the attachment listing the specific fees, including the appeal fee. Because that attachment was not included in its request for judicial notice filed below, we do not consider that attachment or City's instant request for judicial notice in deciding whether the trial court abused its discretion by denying the request filed below. Nevertheless, because City's request for judicial notice on appeal may be pertinent to its argument that its appeal fee is authorized, we address that request in section VII(C) below.

[12] To the extent City alternatively argues the trial court abused its discretion by not taking permissive judicial notice under Evidence Code section 452, subdivision (b), we apply similar reasoning to that set forth above and conclude the court did not abuse its discretion under Evidence Code section 452, subdivision (b), by denying City's request for judicial notice.

45

City asserts the trial court erred by granting CREED's request for a refund of the appeal fees it paid. In so arguing, City cites case law recognizing the validity, in general, of fees imposed to process administrative appeals. (See, e.g., *Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 51; *Friends of Glendora v. City of Glendora* (2010) 182 Cal.App.4th 573.) For purposes of this appeal, we presume agencies may, in general, impose fees on parties that file CEQA appeals. However, City has not shown that in this case the appeal fees imposed on CREED were authorized. As discussed above, the trial court properly denied City's request for judicial notice of a copy of an ordinance that purportedly authorized the appeal fees. Furthermore, that copy omitted the attachment that apparently listed the specific fees, including the appeal fee, authorized by the City council.

On December 23, 2013, City filed with this court a request for judicial notice of a copy of an ordinance that includes an attachment setting forth the list of specific fees, including a $100 appeal fee. However, that request and the attachment included in the copy were not before the trial court below when it decided City had not shown its appeal fee was authorized and granted CREED's request for a refund. The issue before us is whether the trial court erred by granting CREED's request for a refund of the appeal fees paid to City, and we generally cannot consider evidence not contained in the record before the trial court. (See, e.g., *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565.) We deny City's instant request for judicial notice. City does

46

not persuade us we should, or must, take judicial notice under Evidence Code 459[13] of the copy of the ordinance including that attachment.

Because City does not cite any evidence in the record authorizing the $100 appeal fee imposed on CREED for its CEQA appeal and does not dispute it charged that fee, we conclude the trial court properly found City had not shown its appeal fee was authorized. Accordingly, the trial court did not err by granting CREED's request for a refund of the $100 appeal fee it paid.

VIII

*CREED's Motion for Sanctions*

CREED has filed a motion requesting that we impose sanctions against City for certain actions or omissions on appeal. It complains City violated court rules by citing a depublished case in its opening appellant's brief, misquoted and/or misrepresented a statement in a cited case, omitted significant facts from the statement of facts section of its opening appellant's brief, and filed a frivolous request for judicial notice. City opposes the motion for sanctions. We have considered each of CREED's complaints and decline to impose sanctions against City in the circumstances of this case. (Cal. Rules of Court, rule 8.276(a).)

---

13    Evidence Code section 459, subdivision (a), provides: "The reviewing court shall take judicial notice of (1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under Section 451 or 453. The reviewing court may take judicial notice of any matter specified in Section 452. The reviewing court may take judicial notice of a matter in a tenor different from that noticed by the trial court."

DISPOSITION

The judgment is affirmed to the extent it declared City's assessment of the $100 appeal fee invalid and set it aside. In all other respects, the judgment is reversed and the matter is remanded to the trial court with directions that it vacate its order granting the petition (except for its request for a refund of the appeal fee), withdraw, cancel, or otherwise void its peremptory writ of mandate issued on June 4, 2013 (except for ordering City to refund the $100 appeal fee), and issue a new order denying the petition (except for granting its request for a refund of the appeal fee). City shall recover its costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.