Filed 6/4/24  P. v. Cole CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN FREDERICK COLE,<br><br>     Defendant and Appellant. | B327549<br><br>(Los Angeles County<br>Super. Ct. No. A711436) |

APPEAL from an order of the Superior Court of Los Angeles County.  David Walgren, Judge.  Affirmed.

Cuauhtemoc Ortega, Federal Public Defender, Laura Schaefer and Saivandana Peterson, Deputy Federal Public Defenders, under appointment by the Court of Appeal, for Defendant and Appellant.

George Gascon, District Attorney (Los Angeles) and Tracey Whitney, Deputy District Attorney as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, James William Bilderback II, Assistant Attorney General, Shira Seigle Markovich and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1992, a jury found defendant and appellant Stephen Frederick Cole guilty of first degree murder (Pen. Code, § 187, subd. (a); count 1)[1] and arson (§ 451, subd. (b); count 2). As to count 1, the jury sustained a special circumstance allegation that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).) Defendant was sentenced to death. In 2004, the California Supreme Court affirmed the judgment of conviction and sentence of death. (*People v. Cole* (2004) 33 Cal.4th 1158 (*Cole*).)

In 2022, the Los Angeles County District Attorney's Office (LADA) filed a recommendation for resentencing pursuant to section 1172.1, subdivision (a)(1), recommending that defendant's death sentence be recalled and that he be resentenced to a term of life without the possibility of parole (LWOP). The trial court denied the motion, and defendant appeals.[2]

We affirm.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The LADA filed a letter brief of amicus curiae in support of defendant's appeal. On May 22, 2024, the People filed a motion for judicial notice. We hereby grant their request.

# FACTUAL BACKGROUND

I. *Guilt Phase*

    A. <u>Prosecution evidence</u>

The facts of this case are set forth in detail in *Cole*, *supra*, 33 Cal.4th 1158. Briefly, Mary Ann Mahoney (Mahoney) and defendant were involved in an on-again/off-again tumultuous and volatile relationship. In fact, during their relationship, defendant was twice convicted of cohabitant abuse based on his conduct towards Mahoney. (*Id*. at p. 1171.)

In 1987, they rented a home from William Gornik (Gornik) on North Whitnall Highway in North Hollywood. (*Cole*, *supra*, 33 Cal.4th at p. 1171.)

On August 14, 1988, "[a]t approximately 9:00 p.m., the Los Angeles Fire Department received a report of a fire at the North Whitnall Highway residence. Los Angeles Firefighter Zane Testerman and Chief Wilford Bisson were the first to arrive on the scene. Soon after Testerman parked the fire department's sedan in front of the house, defendant knocked on the driver's side window. When Testerman rolled down the window, defendant said, 'I'm the one you're looking for. I lit the house on fire.' Bisson radioed for the police, and Testerman got out of the car to detain defendant." (*Cole*, *supra*, 33 Cal.4th at pp. 1171–1172.)

Defendant repeatedly admitted that he set the house on fire and that he tried to kill Mahoney. He repeatedly said that he was angry at Gornik because he was planning to build a new apartment building at the site, and he was angry at Mahoney and wanted to kill her. (*Cole*, *supra*, 33 Cal.4th at p. 1172.) When asked how he had lit the fire, defendant stated, "'Well, I poured gasoline on [Mahoney] and in the house and lit her and

3

the house on fire.' Defendant appeared to be coherent, did not seem to be excited or injured, and did not smell of alcohol. The police arrived shortly thereafter and took custody of defendant." (*Ibid*.)

Mahoney suffered severe burns and injuries. After 10 days of extreme suffering, Mahoney passed away as a result of smoke inhalation and burns. (*Cole, supra*, 33 Cal.4th at p. 1174.)

B. <u>Defense evidence</u>

"The defense endeavored to show that defendant was guilty of only second degree murder by presenting evidence that he was reacting to Mary Ann's burst of anger [prior to him setting the fire] and was under the influence of alcohol when he ignited the fire. The defense also endeavored to show that defendant intended solely to kill Mary Ann, not to commit arson." (*Cole, supra*, 33 Cal.4th at p. 1174.)

In particular, defendant testified that when he arrived home that evening, he and Mahoney argued. According to defendant, she said "that if he fell asleep on the couch she would 'cut [his] damn balls off with a butcher knife.' Defendant yelled in reply" and "then picked up a plastic container of gasoline," threw the container at Mahoney, said "something to the effect of 'you f***ing b****, I hope you burn in hell,' lit a Bic brand cigarette lighter, and threw it." (*Cole, supra*, 33 Cal.4th at p. 1176.)

The defense also presented the testimony of Dr. Bruce T. Sutkus, a psychologist, who opined defendant had no brain dysfunction, but was egocentric, immature, impulsive, childish, and demanding. (See *Cole, supra*, 33 Cal.4th at pp. 1176–1177.) According to Dr. Sutkus, persons with defendant's profile tended to have "a non-integrated conscience," "a history of aggression

4

and assaultive behavior," and "may be seen as destructive, provocative and irritable[.]"  Dr. Sutkus further opined that, "[b]ecause of the threat of his bad temper, any tension he might have usually results in an immediate discharge to aggression and even destructive reactions."  And, a criminalist with the Los Angeles Sheriff's Department testified about the effect of alcohol on the central nervous system and opined on defendant's alcohol abuse and impairment on the night he murdered Mahoney. (*Cole*, *supra*, 33 Cal.4th at p. 1177.)

II.  *Penalty Phase*

Neither the People nor the defense introduced any additional evidence at the penalty phase.  (*Cole*, *supra*, 33 Cal.4th at p. 1179.)  At an ex parte hearing, defense counsel explained his tactical reasons for declining to present additional evidence at the penalty phase, and the trial court found that counsel's decision not to present any mitigating evidence "was made for sound tactical reasons for the benefit of his client—for the benefit of Mr. Cole."

## PROCEDURAL BACKGROUND

In its recommendation for resentencing, the LADA set forth the statutory presumption in favor of recall and resentencing, and asked the trial court to recall defendant's death sentence and resentence him to a term of LWOP.  The LADA noted that defendant was 71 years old and suffered from numerous medical infirmities, including lung cancer, hepatitis C, cirrhosis of the liver, hypertension, lumbar problems, and a detached retina.  The recommendation further explained, without providing evidence of defendant's prison record, that defendant had been a "model prisoner" with no rules violations of any kind.  The LADA argued that defendant suffered from brain damage and had been

5

neglected and abused as a child.  The People also argued that it was "compelling" that neither the prosecution nor the defense presented any evidence during the penalty phase of defendant's trial.

Several supporting exhibits provided to the LADA by defense counsel were attached to the request, including a 2004 declaration from a mental health expert, a 2004 declaration from a psychologist, newspaper clippings, declarations executed in 2004 and 2006 from three of defendant's family members, and a 2006 declaration from the victim's employer.

The trial court held a hearing on the recommendation.  At the outset of the hearing, the LADA set forth the presumption for recall and resentencing noting that "[t]he presumption can only be overcome if the court finds the defendant is an unreasonable risk of danger to the public safety pursuant to 1172.1(b)(2)."  The LADA argued that there was "no threat to public safety as the defense is not requesting that the inmate be released," noting defendant would be sentenced to LWOP.  The LADA asserted that there was "no evidence to overcome the presumption" and argued, as it did in its motion, that defendant should be resentenced based on his advanced age, medical infirmities, "exemplary" conduct while incarcerated, and the failure of defense counsel to present a penalty phase defense.

Defense counsel echoed the LADA's argument regarding alleged ineffectiveness on the part of trial counsel, and reiterated that there was no evidence to overcome the statutory presumption in favor of resentencing.  Defense counsel explained: "[W]hat needs to be looked at to rebut the presumption of any potential risk of future danger to the public or risk of a super strike that, especially in this case, there is no evidence to show

6

that [defendant] would present such a risk. Not only is he 71 years old and medically infirm[,] he also has, as the [LADA] ha[s] stated, an exemplary record and more than 30 years of incarceration. He has the lowest risk assessment score possible in terms of looking at his potential recidivism.

"So, on the basis of this record, your Honor, we would reiterate that the presumption in favor of resentencing has not been rebutted, and we do not believe it can be rebutted on the basis of his prison behavior."

Following argument, the trial court stated that it had spent a "great deal of time" going through the motion and examining the People's exhibits, that it had reviewed *Cole, supra*, 33 Cal.4th 1158, and that it "also took the time to go through the trial testimony in this case."

Turning to the LADA's arguments concerning defendant's age, mental condition, and disciplinary record in prison, the trial court noted that it had "considered all the factors raised by the [LADA]." It acknowledged that defendant was 71 years old and had "medical conditions," although ones not unique to an older man with a history of extreme alcohol abuse like defendant. The trial court accepted the LADA's representation that defendant had no disciplinary history in prison, but explained that that fact was not particularly compelling given "the bulk of his prison term has been served on death row, . . . probably the most secure building in the state penal system typically characterized by single man cells, multiple armed guards, very limited movement." The trial court reasoned: "[A]lthough I recognize certainly you can still have disciplinary problems in that environment, also one cannot ignore the fact that it is an extremely, extremely controlled environment."

7

The trial court acknowledged the declarations from defendant's postconviction mental health experts, but explained that the jury heard from two defense experts and a prosecution expert who testified about defendant's "brain profile" and "severe alcohol abuse." It concluded that, contrary to counsels' representations, defendant had been "vigorously represented" at trial. After all, there was extensive mitigating evidence, including defendant's mental state and purported brain damage, presented to the jury during the guilt phase. Specifically, defense counsel presented a clinical psychologist who testified at the guilt phase, among other things, that defendant's profile matched someone who was "egocentric, immature, impulsive, childish, demanding, had a nonintegrated [conscience], tended to have a history of aggression and assaultive behavior, high frequency of problems with alcohol, can be manipulative to get out of stressful situations, may be seen as destructive, provocative and irritable, and any tension usually results in immediate discharge to aggression and even destructive reactions." The trial court noted that the same clinical psychologist and a forensic analyst testified about defendant's alcohol abuse and his blood alcohol level from the night of the murder and how it impacted his cognitive abilities.

The trial court continued by highlighting the fact that defendant testified at trial about "taking the can of gasoline, pouring it on [Mahoney], throwing a lighter and setting her aflame" while saying, "'You f***ing b****. I hope you burn in hell.'" He offered no assistance to Mahoney as she ran past him while on fire, and he expressed no remorse while testifying four years later that he "'wanted her to die'" and hated her "to this day." The trial court noted that defendant was a serial domestic

8

abuser and had testified that hitting Mahoney "made him feel good by releasing pent up anger[.]"  And, the trial court reminded counsel that trial counsel had made a record of his tactical decision not to call penalty phase witnesses.

The trial court went on to note that "[t]he facts of this case are barbaric to the extreme," and, quoting from *Cole*, *supra*, 33 Cal.4th 1158, noted that defendant "'was not an immature child at the time of the offense.  Rather he was a 37-year-old man who had some college education and had been steadily employed in the past.'"  It emphasized that after hearing all of the evidence at trial, a jury determined that death was the appropriate sentence, and the trial judge ruling on the motion to vacate the death sentence determined, based on "the heinous, barbaric and brutal nature of the murder, and even after considering mental health issues and alcohol abuse issues and a lack of criminal record, that the death verdict was appropriate."  The trial court also recognized that the California Supreme Court affirmed that judgment on direct appeal.

The trial court advised the parties that it was "quite familiar with Penal Code section 1172.1" and had granted such motions in "appropriate cases."  It explained that it was "also quite familiar with the presumption that exists in a case such as this where the [LADA is] filing the motion."  After "considering all the factors raised by the [LADA]," the trial court declined to recall and resentence defendant to the recommended reduced sentence.  It concluded:  "I think [defendant] has demonstrated not only by the absolutely brutal, premeditated murder of Mary Ann as she lay in bed and was tortured and took 11 days to die, but the fact that four years later he testified he had hate for her and offered no remorse and testified to various things that it felt

9

good to beat her on previous occasions because it helped him release his pent up rage.  [¶]  When the court determines if he's an unreasonable risk, what can the court look to other than has he ever demonstrated the willingness or ability to commit a tortuous murder?  Yes, he has.  So if I look to the general population, who poses an unreasonable risk of committing a homicide or attempted homicide?  Someone who clearly has demonstrated they in fact did commit a homicide and expressed no remorse for committing such a homicide.  [¶]  I think the presumption is overcome.  I think [defendant] is an unreasonable risk of danger to public safety.  And I feel that he could commit a super strike, a homicide or attempted homicide.  Other than no disciplinary actions, I have no evidence before me of regret, remorse, reform.  Nothing whatsoever.  The court specifically finds [that] defendant is an unreasonable risk of danger to public safety, and the court specifically finds that the presumption is overcome even after considering all the factors raised by the [LADA].

"As an additional note, over and above the presumption, however, the court must individually find that this is in the interest of justice.  Even if that presumption was to survive, which the court has specifically ruled it does not, it has to be in the interest of justice.  [¶]  Based on this court's review of the totality of the evidence including all the transcript testimony, the brutal and vicious torture murder committed by the defendant, a repeated and serial domestic abuser, after considering all the testimony, all the evidence, the jury findings, the trial court's findings, California Supreme Court findings, and all the submissions presented by the defendant via the [LADA], after totality, a review of the totality of the evidence in this case and

10

the court's own independent analysis, I specifically find that it is not in the interest of justice to resentence defendant and specifically find it would in fact be contrary to the interest of justice.

"Based on all of that, at this time the motion to resentence . . . defendant pursuant to 1172.1 is denied."

## DISCUSSION

I. *Relevant law*

Section 1172.1[3] provides "that a trial court may recall and resentence a defendant at any time upon the recommendation of . . . [a] specified public official. [Citations.]" (*People v. Braggs* (2022) 85 Cal.App.5th 809, 818.) Section 1172.1 also provides that if the "resentencing request . . . is from . . . a district attorney," then "[t]here shall be a presumption favoring recall and resentencing of the defendant, which may only be overcome if a court finds the defendant currently poses an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18." (§ 1172.1, subd. (b)(2).) "Subdivision (c) of section 1170.18 in turn defines an unreasonable risk of danger to public safety as 'an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of [section 667, subdivision (e)(2)(C)(iv)].' This 'subdivision of section 667 identifies eight types of particularly serious or violent felonies, known colloquially as "super strikes."' [Citation.]" (*Braggs*, *supra*, at p. 818.)

---

[3] Section 1172.1 was amended effective January 1, 2024. We reach our conclusion under the current statute. Defendant directs us to nothing in the new language that requires remanding this matter back to the trial court for another hearing.

11

"In recalling and resentencing pursuant to this provision, the court shall consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice. . . .  The court shall consider if the defendant has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence, if the defendant was a victim of intimate partner violence or human trafficking prior to or at the time of the commission of the offense, or if the defendant is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense, and whether those circumstances were a contributing factor in the commission of the offense."  (§ 1172.1, subd. (a)(5).)

Furthermore, "[t]he court shall state on the record the reasons for its decision to grant or deny recall and resentencing."  (§ 1172.1, subd. (a)(7).)  In addition, "[r]esentencing shall not be denied . . . without a hearing where the parties have an opportunity to address the basis for the intended denial or rejection."  (§ 1172.1, subd. (a)(9).)

Section 1172.1 does not specifically address whether a trial court may reduce a defendant's death sentence to a sentence of LWOP.  That said, legislative history indicates that the trial court does have this authority.  (See Legis. Assem. Bill No. 200 (2021-2022 Reg. Sess.) § 7.)

12

II. *Standards of review*

We review the trial court's denial of recall and resentencing for abuse of discretion. (*People v. Mendez* (2021) 69 Cal.App.5th 347, 353; *People v. E.M.* (2022) 85 Cal.App.5th 1075, 1082.) "'In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citations.] Second, a "'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'" [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.'" (*People v. Strother* (2021) 72 Cal.App.5th 563, 571.)

"We review questions of statutory interpretation de novo." (*People v. E.M., supra,* 85 Cal.App.5th at p. 1082.)

III. *Analysis*

Applying these legal principles, we conclude that the trial court did not err in denying the recommendation to recall and resentence defendant from death to LWOP. It spent a "great deal of time" going through the People's motion and exhibits, read *Cole, supra,* 33 Cal.4th 1158, and reviewed the testimony presented at defendant's trial. It also carefully considered all the factors presented by the LADA and addressed the arguments raised by counsel. And, the trial court specifically expressed its

13

familiarity with section 1172.1 and the statute's presumption. Under these circumstances, we do not find any abuse of discretion. (*People v. Buford* (2016) 4 Cal.App.5th 886, 899; *People v. Covarrubias* (2016) 1 Cal.5th 838, 890 [we do not reweigh the evidence].)

Urging us to conclude otherwise, defendant argues that the trial court failed in several ways to engage in the proper analysis under section 1172.1 and failed to follow the procedure mandated by the statute. We address each in turn.

A. Forward-thinking analysis

Defendant argues that the trial court failed to engage in a forward-thinking analysis in concluding that he poses an unreasonable risk of danger to public safety. We disagree.

After it expressly acknowledged the presumption in favor of recall and resentencing, it found that defendant presented an unreasonable risk of danger to public safety because he demonstrated the willingness or ability to commit a tortuous murder and expressed no remorse; thus, "he could commit a super strike, a homicide or attempted homicide."

Relying on *People v. Williams* (2018) 19 Cal.App.5th 1057, defendant asserts that the fact that he would be resentenced to LWOP and never be released from prison necessarily precluded a finding that he poses an unreasonable risk of danger to public safety. *Williams* is readily distinguishable. As defendant concedes, *Williams* is premised on a completely different sentencing statute (§ 1170.126)[4] that is inapplicable to the facts

---

[4] Section 1170.126, subdivision (a), applies only to persons serving an indeterminate life sentence pursuant to section 667, subdivision (e)(2), or section 1170.12, subdivision (c)(2). Defendant does not fall into either category.

14

presented here. Moreover, even if we adopted defendant's proposition that the presumption in favor of recall and resentencing can never be overcome in cases where the defendant will be resentenced from death to LWOP, that interpretation would transform the statute into a mandate that all capital judgments be recalled and resentenced to LWOP at a minimum. Nothing in the language or legislative history of section 1172.1 indicates that that is what our Legislature intended. (*People v. Walker* (2022) 86 Cal.App.5th 386, 396.)

Moreover, as defendant acknowledges, "danger to public safety" encompasses an unreasonable risk of danger to any other persons, including the nurses, doctors, correctional officers, and other prison personnel who interact with inmates every day, in addition to the other inmates. Although the trial court did not explicitly identify the precise people to whom he poses an unreasonable risk of danger, it expressly found that defendant was a danger to other persons in that there was an unreasonable risk that he would commit another homicide or attempted homicide. That is all that is required under the statute.[5] (See § 1172.1, subd. (b)(2).)

---

[5] It follows that we reject defendant's contention that he was not a danger to public safety because his crime was "personal and unique," not "random." Aside from the fact that the trial court was not obligated to adopt defendant's characterization of his crime, it certainly was entitled to conclude that a person who committed the heinous crime here would pose a danger to public safety.

B.  Statutory factors considered by the trial court

Defendant argues that the trial court did not properly consider the appropriate factors in determining whether he poses a danger to public safety.  We are not convinced.

The trial court properly considered defendant's prison behavior, age, and medical ailments,[6] and nevertheless concluded that the totality of the evidence weighed in favor of a finding that he is a danger to public safety.  (See § 1172.1, subds. (a)(5), (b)(2).)  With respect to his age (71 years old at the time of the hearing) and medical diagnoses (lung cancer, hepatitis C, cirrhosis of the liver, hypertension, lumbar problems, and a detached retina), the trial court reasonably deemed those factors unpersuasive given that defendant proved himself (1) willing to attack someone with whom he lived, (2) while she was asleep, (3) in a manner that did not require physical exertion, and (4) causing great suffering and death.  Taken together, the trial court did not abuse its discretion in weighing these factors in its conclusion that defendant creates an unreasonable risk of danger to others.

Pointing us to the LADA's assertion that he did not have any disciplinary violations and that the California Department of Corrections and Rehabilitation (CDCR) had classified him as a low risk for recidivism, defendant contends that the trial court's finding that he is an unreasonable risk of danger is not supported

---

[6]     While the trial court may not have specifically mentioned defendant's psychological and childhood trauma, that does not compel the conclusion that it did not consider such evidence.  As set forth above, the trial court specifically stated that it considered all arguments raised by the LADA and defense counsel.

16

by the record. But, there are no CDCR reports or documents in the record on appeal,[7] and espousals from attorneys are not evidence. (*People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534; *People v. Hill* (1998) 17 Cal.4th 800, 845.)

Setting that aside, defendant's prison behavior and classification score do not definitely prove that he is not an unreasonable danger to public safety. As the trial court recognized, because defendant has been on death row, "probably the most secure building in the state penal system typically characterized by single man cells, multiple armed guards, very limited movement," the fact that he had no rules violations and maintained a classification score of 60 was of limited value in determining his future risk of danger.[8] (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1265 [despite no record of prison misconduct, trial court did not abuse its discretion in concluding that the defendant posed an unreasonable risk of danger to public safety considering the seriousness of his criminal record].)

It follows that we reject defendant's assertion that the "superior court abused its discretion by substituting its own

---

[7] We note that the People assume, as did the trial court, that these representations are accurate despite the absence of evidence.

[8] Defendant suggests that the trial court wrongly concluded that the CDCR does not keep track of rules violations for those inmates housed on death row. Defendant is mistaken. As set forth above, the trial court expressly noted that there could be disciplinary problems "in that environment" and accepted counsels' representations that defendant had none. Furthermore, the fact that death row inmates *can* be deemed not a danger to public safety does not mean that all such inmates must be so characterized.

17

opinion for the 34 years of CDCR evidence showing [defendant] posed no risk of future violence." (Bolding omitted.) At the risk of sounding redundant, the trial court exercised its discretion by considering the various relevant factors identified in the statute and found defendant to be a danger to public safety.

C. <u>Other evidence considered by the trial court</u>

The trial court also considered other evidence in its careful consideration of the LADA's recommendation. It highlighted the psychological testimony presented at trial reflecting that defendant "tended to have a history of aggression and assaultive behavior, high frequency of problems with alcohol, can be manipulative to get out of stressful situations, may be seen as destructive, provocative and irritable, and any tension usually results in immediate discharge to aggression and even destructive reactions." It also noted that defendant himself testified at trial that physically assaulting Mahoney "made him feel good by releasing pent up anger."

Furthermore, as the trial court indicated, four years after defendant murdered Mahoney, he expressed a disturbing lack of remorse as he testified about his actions. Even on appeal, there is still no evidence that defendant has shown any remorse or insight into his actions in the 30-plus years he had been incarcerated.[9] The trial court properly considered defendant's lack of remorse when rendering its decision. Nothing in the plain language of the statute precludes consideration of factors other than those set forth therein. (See *People v. Buford, supra,*

_____

[9] The fact that defendant was "not physically or virtually present" at the hearing is irrelevant. Defense counsel waived his presence. And there is no argument on appeal that his presence would have somehow demonstrated remorse.

18

4 Cal.App.5th at p. 899 ["[t]he reasons a trial court finds resentencing would pose an unreasonable risk of danger, [and] its weighing of evidence showing dangerousness versus evidence showing rehabilitation, lie within the court's discretion"].)  And the Supreme Court has instructed that "the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety."  (*In re Shaputis* (2011) 53 Cal.4th 192, 218.)

D. Alleged ineffective assistance of trial counsel

Defendant claims that the trial court erred in considering whether defense counsel was ineffective as part of its analysis.  Defendant misreads the record.  It was the LADA and defense counsel who raised the subject of trial counsel's performance.  The trial court simply noted that their criticisms of trial counsel were not well-founded because the trial court record revealed a strategic basis for counsel's decisions regarding the penalty phase presentation.  Regardless, the trial court did not rely upon trial counsel's alleged ineffectiveness in denying the motion; the basis for its decision is set forth in detail above.

E. Defendant's procedural challenge fails

Defendant argues that the trial court failed to follow the procedure mandated by section 1172.1, subdivision (a)(9),[10] by failing to give the parties an opportunity to address its reasons for denying resentencing.

---

[10]    The parties briefs refer to "subdivision (a)(8)."  As set forth above, effective January 1, 2024, section 1172.1 was amended; subdivision (a)(8) is now subdivision (a)(9).

### 1. *Forfeiture*

Preliminarily, we conclude that defendant forfeited this claim because he failed to raise this argument or object to the trial court's process at any point during the hearing. (See *People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"]; *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 (*Garcia*) ["'Claims of error relating to sentences "which, though otherwise permitted by law, were imposed *in a procedurally* or factually *flawed manner*" are waived on appeal if not first raised in the trial court"].)

Defendant could have objected to the trial court not giving a statement of reasons for its intended denial at the beginning of the hearing when the trial court stated, "Then we're here for argument regarding resentencing. At the last court date the parties had represented that it would just be argument. Is that still the case?" Instead of objecting, defense counsel agreed with the proposed procedure, saying, "Yes, your Honor." Defendant also could have lodged an objection when the LADA concluded its argument and the court turned to defense counsel and explained that it was ready to "hear argument and anything you want to discuss." Instead of objecting, defense counsel simply explained why recall and resentencing should be granted. And, defendant could have objected that the trial court had not stated the reasons for the denial before making its final decision when, immediately before ruling, the trial court asked if both sides submitted, indicating that it was ready to make a ruling. Again, defense counsel acquiesced in the trial court's procedure, saying only, "I submit." Finally, defendant could have objected to the

trial court denying the request for recall and resentencing without giving him an opportunity to respond to its reasoning at the end of the hearing; instead, he remained silent.

Because defendant had multiple opportunities, but did not, object to the trial court's procedure in adjudicating the request for resentencing, any claim of error in that regard is forfeited. (*Garcia*, *supra*, 185 Cal.App.4th at p. 1218.)

2. *The trial court did not err*

Forfeiture aside, the trial court did not err.

As set forth above, section 1172.1, subdivision (a)(9), provides, in relevant part: "Resentencing shall not be denied, nor a stipulation rejected, without a hearing where the parties have an opportunity to address the basis for the intended denial or rejection." According to defendant, the trial court was required to issue a tentative ruling, allow the parties to respond, and then formally rule. We disagree.

The statute's requirement that the parties be given the "opportunity to address the basis for the intended denial" simply means that the parties must be allowed to address the court at a hearing before it ultimately rules. (§ 1172.1, subd. (a)(9).) We do not interpret the phrase "to require a tentative ruling in advance of the actual" decision. (*People v. Zuniga* (1996) 46 Cal.App.4th 81, 84; see also *People v. Bautista* (1998) 63 Cal.App.4th 865, 870.) Rather, "it refers to procedural due process which, although not subject to precise definition [citation], requires notice and an opportunity to be heard." (*Ibid.*; see also *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 517 [""[R]easonable notice and a reasonable opportunity to be heard . . . is all that is required [for due process]""].)

21

Legislative history supports our conclusion.  At the time the Legislature was considering an amendment to the statute, it was noted that the then-existing statute (former section 1170) did "'not provide adequate structure for the resentencing process, leaving many requests languishing in limbo, or worse—denied without reason.'"  (Assem. Comm. on Public Safety, Analysis of Assem. Bill No. 1540 (2021-2022 Reg. Sess.) Apr. 27, 2021, pp. 3-4.)  Thus, the Legislature added the statutory right to counsel and a hearing to "'address equity and due process concerns in how courts should handle second look sentencing requests.'"  (*Id.* at p. 4.)

In fact, the Legislature's stated purpose for adding former subdivision (a)(8) (now subdivision (a)(9)) was to "*prohibit the court from denying a recall and resentencing motion without a hearing,*" (Sen. Comm. on Public Safety, Hearing on Assem. Bill No. 1540 (2021-2022 Reg. Sess.) July 6, 2021, p. 2), ensuring "due process . . . in these types of resentencing cases" (*id.* at p. 3).  But there is no indication in the legislative history that section subdivision (a)(9) was intended to provide a mandatory order of operations for a court considering a recommendation to recall and resentence a defendant.

The trial court adhered to proper procedure under section 1172.1.  The parties had the opportunity to be heard before the trial court denied the petition.  Specifically, the trial court held a hearing during which it heard from both the LADA and defense counsel regarding the statutory presumption, why defendant did not pose an unreasonable risk of danger to public safety, and why defendant should be resentenced.  After hearing these arguments, along with thoroughly considering the exhibits attached thereto the motion, the factors identified by the LADA,

22

and the trial record, it concluded that defendant was an unreasonable risk of danger to public safety before denying recall and resentencing. That is all that was required.

Urging us to conclude otherwise, defendant argues that "not only did the superior court not provide the parties an opportunity to address the intended reasons for rejection prior to asking both parties to submit—but the majority of the court's oral ruling focused on issues of apparent concern *not* contemplated by the statute, like whether trial counsel was ineffective, or whether [defendant's] medical conditions were unique for a 71-year-old man with a history of alcoholism." As set forth above, it was defendant and the LADA who injected these issues into the discussion by including them in their argument; the trial court merely addressed them as part of its discussion explaining why the request for resentencing was being rejected.

Moreover, the trial court's response to the LADA and defendant raising those issues was not the "majority" of its ruling; as detailed above, the trial court considered postconviction factors, psychological evidence, the trial record, and defendant's lack of remorse, in addition to the facts of his heinous crime, to conclude that the totality of the evidence weighed in favor of a finding that defendant is a danger to public safety.

Defendant further contends that "[h]ad the superior court placed these concerns on the record prior to asking both sides to submit, counsel for [defendant] could have argued that the question of whether trial counsel was indeed ineffective was irrelevant to the rebuttal of the presumption created by the statute." However, at no point during the trial court's engagement with the deputy district attorney and defense counsel about trial counsel's alleged ineffectiveness did defendant

23

seek to withdraw that point from the trial court's consideration, nor did defendant argue that the issue raised by the LADA and defense counsel was irrelevant to the decision being made.[11]

Furthermore, contrary to defendant's argument on appeal, there is no indication in the appellate record that the trial court created some sort of "relationship" between the alleged ineffective assistance of counsel and defendant's unreasonable risk to public safety; rather, the trial court noted that the attempted relationship that the LADA and defense counsel attempted to create was not factually well-founded.

Defendant also argues that the trial court's finding that it would not be in the interests of justice to resentence him constitutes error: "By injecting an additional, improper step in denying resentencing, the superior court abused its discretion and rewrote the statute." (Bolding omitted.) Defendant is mistaken.

The trial court took the "interest of justice" language directly from the statute itself. Section 1172.1, subdivision (a)(3)(A), provides, in pertinent part, that a resentencing court "may, in the interest of justice and regardless of whether the original sentence was imposed after a trial or plea agreement," "[r]educe a defendant's term of imprisonment by modifying the sentence."

And in referencing this statutory language, the trial court was simply explaining that, even if it did recall the sentence, it would nevertheless find that it was not in the interest of justice to reduce defendant's sentence. In other words, the trial court

---

[11]     The People agree that defense counsel's alleged ineffectiveness was irrelevant to the issue of dangerousness under section 1172.1.

24

advised the parties that regardless of any recall of sentence, a sentence of death was still the appropriate punishment for defendant's vicious crime.

Citing *People v. Pierce* (2023) 88 Cal.App.5th 1074 (*Pierce*), defendant argues that "[t]he court's role in deciding whether to resentence is clearly circumscribed, and whether resentencing is in the interest[] of justice in the court's view is not a factor to be considered where there is an explicit presumption in favor." Defendant's reliance on *Pierce* is misplaced.

In *Pierce*, the defendant appealed after the trial court summarily denied the CDCR's recommendation to recall his sentence, finding that the defendant had pleaded no contest to extremely violent and serious crimes and that it did not believe that the interests of justice would be served by granting the request. (*Pierce, supra*, 88 Cal.App.5th at pp. 1077–1078.) After noting the new requirements of section 1172.1, the appellate court remanded the matter so that the trial court could consider the CDCR's request under the new and clarified procedure and guidelines of the statute. The court noted, however, that it "express[ed] no opinion whether appellant's sentence should be recalled or, if it is recalled, whether he should be resentenced." (*Pierce*, at p. 1079.) It did not, as defendant suggests, hold that a court may not consider the interests of justice in resentencing a defendant. In fact, the contrary is true. The appellate court specifically explained that "section 1172.1, subdivision (a)(3)(A) provides that, 'in the interest of justice and regardless of whether the original sentence was imposed after a . . . plea agreement,' the resentencing court may 'reduce a defendant's term of imprisonment by modifying the sentence.'" (*Pierce*, at p. 1079.)

25

### 3. *No prejudice*

Even if the trial court had followed the procedures defendant proposes, the result would have been the same; thus, he has not demonstrated prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) On appeal, defendant largely rehashes the arguments he made to the trial court. For the reasons set forth above, those arguments fail.

## DISPOSITION

The order denying the petition for recall and resentencing is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT


26